IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

WILLIAM CLAYTON CHOATE                                                              PLAINTIFF

v.                                            Civil No. 4:20-cv-04109

SHERIFF JACKIE RUNION; CAPTAIN GOLDEN
ADAMS; NURSE STEPHEN KING; WARDEN
JEFFIE WALKER; DR. KEVIN MCCAIN; and
AL LANDRETH (formerly John Doe Officer
Admin. G.)                                                                           DEFENDANTS

## MEMORANDUM OPINION

This is a civil rights action filed *pro* se by Plaintiff, William Clayton Choate, under 42 U.S.C. § 1983. On February 10, 2021, the parties consented to have the undersigned conduct all proceedings in this case including a jury or nonjury trial and to order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 16). Before the Court is a Motion for Summary Judgment filed by Defendants King and McCann.[1] (ECF No. 114). Plaintiff has filed a Response in opposition to the motion. (ECF No. 139).[2]

### I. FACTUAL BACKGROUND

Plaintiff is no longer incarcerated and now resides in El Dorado, Arkansas. His claims in this action arise from alleged incidents which occurred while he was incarcerated in the Miller County Detention Center ("MCDC") in Texarkana, Arkansas.

At all times relevant Defendant King was a nurse and Defendant McCann was a nurse

---

[1] Defendant McCann is incorrectly identified in the case caption as Dr. Kevin McCain.

[2] Defendants Adams, Landreth, Runion, and Walker ("County Defendants") also filed a Motion for Summary Judgment. (ECF No. 118). This motion will be addressed in a separate order. The Court will consider the relevant portions of the exhibits set forth in the pleadings filed by the County Defendants and cite to them as necessary in this opinion.

practitioner who provided medical services to inmates housed at the MCDC through a contract with their employer - Southern Health Partners, Inc. ("SHP"). (ECF Nos. 115-1, 115-4).

On March 7, 2020, Plaintiff was booked into the custody of the MCDC where he remained until he was transferred to the Arkansas Department of Corrections ("ADC") on February 24, 2021. (ECF Nos. 31, 118-1).

Defendants state Plaintiff did not report that he suffered from any serious medical needs when he was booked into the MCDC but did inform them he was taking and abusing Klonopin – a benzodiazepine medication used to treat anxiety. (ECF No. 115-1). However, Plaintiff states he informed Defendants that he suffered from hypertension. (ECF No. 140).

On March 8, 2020, Plaintiff was placed on a benzodiazepine detoxification regiment. (ECF No. 115-1). On March 23, 2020, the MCDC promulgated the Standard Operating Procedure 05.00 Pandemic and Public Health Emergency. Procedure 05.00 applies to all MCDC staff and sets out guidance for the use of Personal Protective Equipment ("PPE"), isolation, and quarantine of inmates. (ECF No. 118-1). The policies implemented were designed to educate staff on CDC, State, and Local Department of Health Guidelines; appropriate quarantine and isolation of inmates; appropriate use of PPE; implementation of temperature checks; cleaning and disinfecting of jail surfaces; and limiting the transmission of Covid-19 by suspending fingerprinting, property releases, and lobby visitation. *Id.*

These policies were to be implemented by phases, depending on the ebb and flow of the pandemic. Phase One was implemented on April 30, 2020. Phase Two was implemented on May 27, 2020. Phase One was reactivated on June 17, 2020. Phase Two was reactivated on September 10, 2020. (ECF No. 118-1). The policies and procedures, as promulgated, were based on the evolving science as it was understood at the time and the policies and procedures represent a good-

faith effort to limit the spread of the Covid-19 virus within the MCDC. *Id.*

Defendant King states he is familiar with the Covid-19 policies and procedures implemented at the MCDC and that these policies, as promulgated, were based on the evolving medical science as it was understood at the time. (ECF No. 115-1).

On June 22, 2020, Plaintiff complained of chills, body aches, dizziness, and slight chest pains. He was seen on June 24, 2020, and prescribed Tylenol and Ibuprofen for 14 days. At that time, Plaintiff's temperature was 98.1 degrees. (ECF No. 115-1).

On June 24, 2020, Plaintiff was moved from Max Bravo pod to West Echo quarantine pod due to a possible Covid-19 infection. (ECF No. 115-1). That same day, Plaintiff was seen by the medical staff for body aches, shivering, and chest pains. Plaintiff was instructed to increase his fluid intake. At that time, Plaintiff's temperature was 97.3 degrees. *Id.*

On June 27, 2020, Plaintiff put in a request to see the medical staff. On June 28, 2020, medical staff attempted to see Plaintiff, but he refused to take his medications. (ECF No. 115-1). Plaintiff states he did not take his medication because it was causing severe stomach pain. (ECF No. 140).

On July 1, 2020, the population at the MCDC underwent mass testing for Covid-19. Defendant King states the testing was performed as soon as practicable after it became available through the Arkansas Department of Health. (ECF No. 115-1). Nasal swabs were collected from the inmates and employees and the samples were sent to the Arkansas Department of Health for testing. The results showed Plaintiff tested positive for Covid-19. *Id.*

On July 10, 2020, Plaintiff was seen by the medical staff for shortness of breath and chest pain. At that time his lungs were noted to be clear bilaterally and his temperature was 97.9 degrees. On that date, Plaintiff again refused to take his medications. (ECF No. 115-1).

On July 11, 2020, Plaintiff was seen by the medical staff after he complained of "not feeling better." (ECF No. 115-1). At that time Plaintiff's temperature was 97.9 degrees and a chest x-ray was ordered and performed that same day. The x-ray showed no evidence of acute cardiopulmonary disease, communicable disease, or active tuberculosis. *Id.*

Defendant King states the nursing staff was in communication with higher level medical providers during the entire time Plaintiff was treated at the MCDC. (ECF No. 115-1, p. 2). Defendants King and McCann were not responsible for passing out cleaning supplies to inmates at the MCDC. (ECF Nos. 115-1, 115-4). Defendants King and McCann did not have any authority or control over where inmates in the MCDC were placed for housing. (ECF Nos. 115-1, 115-4).

## II. PROCEDURAL BACKGROUND

Plaintiff filed his verified Complaint *pro se* on December 22, 2020, pursuant to 42 U.S.C. § 1983. (ECF No. 1). He asserts the following claims against Defendants King and McCann in the Complaint: Claim 1 - Future Harm; Claim 2 - Denial/Refusal Medical Care; and Claim 3 - Deliberate and Reckless Indifference to an Imminent threat. (ECF No. 1, pp. 6, 8, 11). He is suing Defendants in both their individual and official capacities. *Id.*

On February 25, 2021, Plaintiff filed a Supplement to the Complaint asserting three additional claims against Defendants King and McCann: Claim 4 - Failure to Protect or Intervene and Future Harm; Claim 5 - Prolonged exposure to severely mentally-Inmate (excessive noise/sleep deprivation unsanitary living conditions); and Claim 6 – Retaliation. (ECF No. 21). The Court notes this Supplement is not verified.

On February 25, 2022, Defendants King and McCann filed a Motion for Summary Judgment, Brief in Support, and Statement of Facts. (ECF Nos. 114, 115, 116). They argue they have not engaged in any type of conduct that resulted in a violation of Plaintiff's constitutional

4

rights and Plaintiff cannot prove they followed a policy or custom that resulted in a violation of his rights.

Plaintiff filed Responses to the motion and statement of facts. (ECF Nos. 139, 140). He also submitted a Notice of Other Arguments and a Supplement with 238 pages of exhibits. (ECF Nos. 142, 143). However, none of these responses were verified. Plaintiff argues summary judgment is not appropriate because there are material facts in dispute.

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

5

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998). To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability on the part of a defendant, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted).

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). To sustain an official capacity claim against such an entity a plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). Thus, Plaintiff's official capacity claims against Defendants King and McCann are "functionally equivalent" to alleging their employer, SHP, had "a policy, custom, or [took an] official action" that deprived him of his constitutional rights. *Veatch,* 627 F.3d at 1275*; Johnson*, 452 F.3d at 973.

To establish a claim for "custom" liability, Plaintiff must demonstrate:

6

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the official of that misconduct; and
3) That Plaintiff was injured by acts pursuant to the government entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas County Medical Dept.,* 725 F.3d 825, p. (8th Cir. 2013). "A single deviation from a written, official policy does not prove a conflicting custom." *Id.* (quoting *Jane Doe A v. Special Sch. Dist. of St. Louis,* 901 F.2d 642, 646 (8th Cir. 1990)).

## IV. DISCUSSION

### A. Claims Relating to Covid-19

Claims 1 – 4 involve overlapping allegations relating to Covid-19. Generally, Plaintiff alleges Defendants King and McCann failed to protect him from present and future harm from Covid-19, failed to provide him adequate medical care for Covid-19, and exhibited deliberate and reckless indifference to the threat of Covid-19.

### 1. Description of Claims 1 - 4

Plaintiff describes Claim 1 as "Future Harm". He alleges Defendants King and McCann and others:

> Failure to report MCDC staff that tested positive for Covid-19 in early June 2020, failure to test inmates for Covid-19, failures to isolate/quarantine, deliberate and reckless disregard for PPE, deliberate and reckless to provide adequate sanitation, disinfectants, failure to consistently take inmate temperature, failures to consistently provide face masks, failure to reduce the inmate population to allow space to quarantine and failure to repair inoperable inmate emergency panic/call buttons in Max A/Max E lockdown cells.

(ECF No. 1, p. 6). For his official capacity claim Plaintiff states: "My timely grievances, medical requests and personal conversations/complaints with staff concerning my symptoms will show that

7

MCDC was fully aware of my serious medical conditions deliberately choose to ignore and deny proper Covid-19 testing and medical care to myself and others similarly situated…*Id.*

In Claim 2, Plaintiff alleges Defendants King and McCann denied him medical care from July 22, 2020, through July 13, 2020. (ECF No. 1, p. 8). He describes this claim as follows in relevant part:

> On 6/22/20 I and others were exhibiting clear symptoms of Covid-19. On 6/25/20 I and other inmates were moved to quarantine without being tested or even seeing medical staff. The quarantine had 10 beds, however it was so packed, there were even 4 or 5 inmates sleeping on the floor. Never were we tested, never did we see a Doctor our symptoms were severe…
>
> MCDC finally test the jail on 7/1/20. On 7/6/20 those test results revealed that out of 320 inmates 80 inmates were positive and 5 staff were positive, some of which had never missed a day of work.
>
> I was one of the 80 inmates who tested positive, my symptoms continued for 3 weeks. I filed grievances and numerous requests and at no time was I ever allowed to see a Doctor…

*Id.* Plaintiff describes his official capacity claim under Claim 2 almost word for word as he described it under Claim 1. *Id.* at p. 9.

In Claim 3, Plaintiff alleges Defendants King and McCann exhibited deliberate and reckless indifference to the threat of Covid-19. Plaintiff specifically states in relevant part:

> At the beginning of June 2020, MCDC staff tested positive for Covid-19. These infections were the 1st confirmed infections, yet MCDC hid the infection from the Arkansas Department of Health, Inmates in the jail, the families of those inmates and Defense Attorneys. Although my Covid-19 symptoms were clear, on 6/24/20 MCDC failed to administer Covid-19 tests to myself and other symptomatic inmates.
>
> Despite my requests to see a Doctor, I was only allowed to see nurses who were texting my situation with Doctor McCain. Only after continued denials from MCDC to the symptomatic inmates, inquiring family members, defense attorneys and local newspapers, did MCDC finally test the MCDC population on 7/1/2020…
>
> During the month I was infected with Covid-19 and was experiencing symptoms,

8

> MCDC and Nurses down played my symptoms, accused me of faking, denied me access to a Doctor and failed to treat my symptoms.

(ECF No. 1, p. 11). Plaintiff's description of his official capacity claim under Claim 3 is also similar to his claims in Claims 1 and 2. He states his "grievances, medical requests and personal conversations/complaints…[informed Defendants] of my serious medical condition and [they] deliberately chose to ignore and deny proper Covid-19 testing and medical care… *Id.* at pp. 11-12.

In Claim 4, Plaintiff alleges Defendants King and McCann failed to protect him from Covid-19. He specifically states in part:

> On 6/22/20, I and others in the jail started experiencing what appeared to be Covid-19 symptoms. I spoke with Head Nurse Steven King who told me to file a medical request on the kiosk, so I did…On 6/24/20 I, along with 14 others, were moved from regular housing locations and placed into West-echo quarantine. At no time was I tested for Covid-19, nor were any of the others. At no time were we ever allowed to see any doctor, or doctor employed by Southern Health Partners.
>
> At various times over the course of the two weeks, inmates were moved in/out of our quarantine room, none of the inmates coming or going were ever tested for Covid-19. At one point two Inmates, whose symptoms were very severe, were transported to the local ER; they never returned. We all had mixed/various symptoms, mild and severe. Toward the end of the 2 week (13 days) in quarantine, the bunks were all filled and there were 5 or 6 inmates sleeping on the floor – it was over crowded…
>
> During the time I was in quarantine with the others, Head Nurse Steve King entered the room one morning, removed his mask and said, 'We're assuming you all have Covid. But Covid is nothing to be afraid of, see, I took my mask off.'
>
> I have hypertension…MCDC disregarded these health risks. Just as they have for 10 months (especially since December 2020) disregarded PPE, stopped wearing or passing out face masks, stopped doing symptom checks, no testing or contact tracing and have kept the jail over max capacity…not allowing for social distancing or quarantine intake protocol…
>
> Even in a pandemic, from 11/6/20 to 12/5 20 we were unable to clean our cells at all…From 12/21/20 to 1/1/21 we were unable to clean our cells, from 1/4/21 to 1/11/21 we were unable to clean or cells, and the current stretch from 1/18/21 to

>the present (1/29/21) we have been unable to clean our cells with any cleaners or proper disinfectants…

(ECF No. 21, pp. 1-4). As for his official capacity claim under Claim 4, Plaintiff states:

>Any requests, complaint or grievances filed through MCDC's system bounce between staff through a 'run around' response system, causing the entire grievance/request system to be a 'dead end'. My requests…medical requests, grievances and even family phone calls to MCDC officials to test us symptomatic inmates for Covid-19 were deliberately ignored…pre-existing health conditions were not enough to get the proper medical response or proper Covid-19 testing. MCDC also ignored CDC, Arkansas Department of Health and Jail Standards guidelines for Jail/Prison handling of Covid-019 protocol…

*Id.* at p. 4.

### 2. Applicable Law/Deliberate Indifference

In *Helling v. McKinney,* 509 U.S. 25, 33-34 (1993), the Supreme Court held the Eighth Amendment protects against future harm to inmates if the plaintiff proves threats to personal safety from conditions, such as mingling of inmates with serious contagious diseases with other inmates, and if the conditions reveal deliberate indifference to a substantial risk of serious harm. An Eighth Amendment claim for failure to protect is comprised of two elements. First, an "inmate must show that [he] is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the inmate must establish that the Defendants recklessly disregarded that risk. *Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998). The prison official's state of mind is measured by a subjective, rather than an objective standard. *Farmer,* 511 U.S. at 838-839. "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," namely, a "mental state akin to criminal recklessness." *Saylor v. Nebraska,* 812 F.3d 637, 644 (8th Cir. 206) (citations and quotations omitted). ("[D]eliberate indifference must be viewed from [defendant's] perspective at the time in question, not with hindsight's perfect vision").

The Eighth Amendment prohibition of cruel and unusual punishment also prohibits deliberate indifference to the serious medical needs of prisoners. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on such a claim, Plaintiff must prove Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted). A plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need." *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). However, intentionally denying or delaying access to medical care may constitute deliberate indifference. *See Estelle,* 429 U.S. at 104-05; *Dulany*, 132 F.3d at 1239.

### 3. Analysis of Claims 1 - 4

"The Court is keenly aware of the significant health risks associated with COVID-19 and the ease with which this disease is transmitted, especially in a prison setting." *Tate v. Arkansas Dept. of Corr.,* No. 4:20-cv-0558, 2020 WL 7378805, *8 (E.D. Ark. Nov. 9, 2020). It has been said that "[p]risons are petri dishes for contagious respiratory illnesses." *United States v. Emanuel,* 20-cr-0048, 2020 WL 1660121, *4 (S.D.N.Y. March 31, 2020)(cleaned up)(finding the jail had not met the most basic recommendations of the CDC to prevent the spread of the virus). "Public health experts agree that incarcerated individuals are at special risk of infection, given their living situations, and may also be less able to participate in proactive measures to keep themselves safe, infection control is challenging in these settings." *Id.* at *5 (cleaned up). The population in county jails is transient, funds are limited, and general health conditions tend to be worse than at Federal Bureau of Prisons facilities. *Id.* at *4. However, "[t]he prison is a finite space. It would be impossible to isolate every inmate who is *potentially* infected—the prison does not have enough space to house each such inmate in a single cell." *Kesling,* 476 F. Supp. 3d at 1088 (emphasis in original).

"As judges, our conscribed role is not to assess whether [Defendants King and McCann] could have done more to contain the virus—no doubt they could have. Our limited role is thus to determine whether [these Defendants] ha[ve] made the requisite showing that [their] efforts to combat COVID-19 satisfied the constitutionally required minimum." *Valentine v. Collier,* 978 F.3d 154, 158 (5th Cir. 2020). While Plaintiff alleges Defendants King and McCann failed to

12

comply strictly with the guidelines of the CDC,[3] the failure to enact or comply with these guidelines does not equate to the violation of the Eighth Amendment. *Id.* at 164 ("The Eighth Amendment does not enact the CDC guidelines"). Moreover, "[w]hat we know about COVID-19 and the spread of the novel coronavirus is constantly changing, as new information is released by medical researchers, agencies, and other authorities." *Kesling v. Tewalt,* 476 F. Supp. 3d 1077, 1087 (D. Idaho 2020).

Here, Plaintiff tested positive for Covid-19 and consequently he clearly suffered from a serious medical condition. The question then becomes whether Plaintiff has alleged facts (rather than conclusions) from which the Court can plausibly infer the subjective prong for deliberate indifference has been met. "[L]egal conclusions and [t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements are not enough to state a claim for relief." *Ashcroft v. Iqbal,* 566 U.S. 662, 678 (2009). Plaintiff is required to plead facts that show more than the "mere possibility of misconduct." *Id.*

Other than naming Defendants King and McCann as individuals involved in being deliberately indifferent to the risk (present and future) of Covid-19, and failing to protect him from Covid-19, Plaintiff does not make any specific factual allegations – in a personal or official capacity – against these Defendants. Plaintiff has not alleged facts from which the Court can infer that either of these Defendants deliberately disregarded a substantial risk of serious harm to him. The summary judgment record confirms on March 23, 2020, the MCDC promulgated extensive policies and procedures to deal with the threat of Covid-19. The Court finds these policies and

---

[3] Centers for Disease Control, *Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed November 30, 2021).

procedures represented a good-faith effort to limit the spread of the Covid 19 virus within the facility. Defendant King testified he was familiar with these policies and provided care in accordance with those policies.

Moreover, Plaintiff's claim he was denied adequate health care once he contracted Covid-19 fares no better. The summary judgment record confirms Plaintiff was seen on June 24, 2020, by the medical staff two days after he complained of chills, body aches, dizziness, and slight chest pains. At that time his temperature was 98.1 degrees, and he was prescribed Tylenol and Ibuprofen for 14 days. That same day, Plaintiff was moved from Max Bravo pod to West Echo quarantine pod due to a possible Covid-19 infection. Plaintiff was seen again that day by the medical staff for body aches, shivering, and chest pains. He was instructed to increase his fluid intake. At that time, Plaintiff's temperature was 97.3 degrees.

In addition, the summary judgment record shows on July 1, 2020, the MCDC underwent mass testing for Covid-19. Defendant King states the testing was performed as soon as practicable after it became available through the Arkansas Department of Health. Nasal swabs were collected from the inmates and employees and the samples were sent to the Arkansas Department of Health for testing. The results showed Plaintiff tested positive for Covid-19. On July 10, 2020, Plaintiff was seen by the medical staff for shortness of breath and chest pain. At that time his lungs were noted to be clear bilaterally and his temperature was 97.9 degrees.  On July 11, 2020, Plaintiff was seen by the medical staff after he complained he was not feeling better. At that time Plaintiff's temperature was 97.9 degrees and a chest x-ray was ordered and performed that same day. The x-ray showed no evidence of acute cardiopulmonary disease, communicable disease, or active tuberculosis.  Defendant King also testified that the nursing staff was in communication with higher level medical providers during the entire time Plaintiff's was treated at the MCDC.

The Court finds the medical care provided to Plaintiff by Defendants King and McCann was more than constitutionally adequate. Although Plaintiff has a constitutional right to adequate health care, he does not have the right to health care of his choice (*i.e.* to be seen by a doctor). *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (an inmate has no constitutional right to a particular course of treatment).

Finally, Plaintiff has not described any policies of SHP – the employer of Defendants King and McCann – which allegedly contributed to a violation of his constitutional rights to support any official capacity claims in Claims 1 - 4. Instead, he generally refers to policies of the MCDC. Accordingly, Defendants King and McCann are entitled to summary judgment on both the personal and official capacity claims set forth in Claims 1 – 4.

**B. Claim 5 – Prolonged exposure to Severely Mentally Ill Inmate**

In Claim 5, Plaintiff alleges Defendants King and McCann subjected him to excessive noise, sleep deprivation, and unsanitary living conditions by placing a mentally ill inmate near him for approximately thirty (30) days. (ECF No. 21, pp. 6-8). He goes on to state in part:

> I personally viewed [the inmate] playing with his feces. Urine, feces and trash became a normal fixture in our day room, as it could easily be noticed leaking at all times from the cracks under his cell door…The area was cleaned sometime throughout the week, however, we were on a stretch of 11 days of not being able to clean in our cells…the loss/lack of sleep started wearing me down physically and mentally. Very disturbing thoughts caused me to question my sanity and I was placed on the list to see the mental health nurse.

*Id.* Plaintiff describes his official capacity claim as follows: "MCDC has a custom or policy of indiscriminately housing mentally-ill inmates, despite the degree of mental-illness, with regular inmates. In max echo there are two cells which can hold only one inmate each; MCDC has a custom of placing mentally-ill inmates in these cells…" (ECF No. 21, p. 8).

Here, there is no summary judgment evidence to support Plaintiff's allegations against Defendants King or McCann under Claim 5 in either a personal or official capacity. First, Defendants King and McCann each testified in their affidavits they had no control, authority, or involvement in the housing of inmates or the distribution of cleaning supplies at the MCDC. Second, Plaintiff does not describe any policy of custom of SHP which allegedly violated his rights. He only mentions the policies and procedures of the MCDC in his official capacity claim. Accordingly, Defendants King and McCann are entitled to summary judgment on Claim 5.

### C. Claim 6 – Retaliation

Plaintiff describes Claim 6 as retaliation and specifically states:

> The acts and omissions of this Claim #6 are the exact same as described in Claim #5 (exposure to mentally-Ill inmate), but with a contextual emphasis on Warden Jeffie Walker moving Inmate…from the psyche cell and returning him to Max echo…Warden Walker made this move of…returning to our housing location …despite our requests, grievances, complaints, etc…which explain his excessive noise, feces and urine.
>
> My cell-mates …and myself have pending civil actions against MCDC (Warden Walker included). Around the time that MCDC (Defendants) were served of our complaints, all three of us were moved into the same cell. Warden Walker personally had [the inmate] moved back to Max Echo around this same time, despite knowing of the torture...Warden Walker has subsequently ignored complaints, this is clearly mental torture and retaliation.

(ECF No. 21, p. 10). Plaintiff describes his official capacity claim as, "The custom or policy in this Claim #6 is the exact same as Claim #5, but adding MCDC's custom of retaliation against inmates who file grievances or complaints. *Id.*

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary firmness' from continuing in the activity;" and (3) the adverse action was motivated at least in part by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.,*

673 F.3d 799, 807-808 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). Because nearly every otherwise routine administrative decision may potentially be viewed as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Plaintiff has failed to state any claims based on retaliation against Defendants King or McCann because he has not alleged that either of these Defendants were personally involved in placing the mentally ill inmate near him. Defendants King and McCann each submitted affidavits stating they had no authority, control, or involvement in where any inmates are housed at the MCDC.

Likewise, Plaintiff's official capacity claim fails because he does not allege that any policy of SHP was involved in the alleged violation of his constitutional rights. Accordingly, Defendants King and McCann are entitled to summary judgment on Claim 6.

### V. CONCLUSION

For the reasons stated above, Defendant King and McCann's Motion for Summary Judgment (ECF No. 114) is **GRANTED**. Accordingly, all individual and official capacity claims against them are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED** this 16th day of August 2022.

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE