IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

WILLIAM CLAYTON CHOATE                                                    PLAINTIFF

v.                                     Civil No. 4:20-cv-04109

SHERIFF JACKIE RUNION; CAPTAIN GOLDEN
ADAMS; NURSE STEPHEN KING; WARDEN
JEFFIE WALKER; DR. KEVIN MCCAIN; and
AL LANDRETH (formerly John Doe Officer
Admin. G.)                                                               DEFENDANTS

## MEMORANDUM OPINION

This is a civil rights action filed *pro* se by Plaintiff, William Clayton Choate, under 42

U.S.C. § 1983.  On February 10, 2021, the parties consented to have the undersigned conduct all

proceedings in this case including a jury or nonjury trial and to order the entry of a final judgment

in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 16).

Before the Court is a Motion for Summary Judgment filed by Defendants Adams, Runion,

Walker, and Landreth ("County Defendants"). (ECF No. 118). Plaintiff has filed a Response in

opposition to the motion (ECF No. 139) and the County Defendants have filed Replies. (ECF No.

145, 147).[1]

## I. FACTUAL BACKROUND

Plaintiff is no longer incarcerated and now resides in El Dorado, Arkansas.  His claims in

this action arise from alleged incidents which occurred while he was incarcerated in the Miller

County Detention Center ("MCDC") in Texarkana, Arkansas.

---

[1] On August 16, 2022, the Court entered a Memorandum Opinion granting Defendants King and McCann's motion for summary judgment and dismissing all claims against them with prejudice. (ECF No. 153). The Court will consider the relevant portions of the exhibits set forth in the pleadings filed by Defendants King and McCann and cite to them as necessary in this opinion.

At all times relevant to the instant lawsuit, Defendant Walker was the Warden at the MCDC, Defendant Runion was the Sheriff of Miller County, Arkansas, Defendant Adams was a Captain at the MCDC, and Defendant Landreth was the Jail Administrator at the MCDC. (ECF Nos. 118-1, 118-4).

On March 7, 2020, Plaintiff was booked into the custody of the MCDC where he remained until he was transferred to the Arkansas Department of Corrections ("ADC") on February 24, 2021. (ECF No. 118-1).

Defendants state Plaintiff did not report that he suffered from any serious medical needs when he was booked into the MCDC but did inform them he was taking and abusing Klonopin – a benzodiazepine medication used to treat anxiety. (ECF No. 115-1). However, Plaintiff states he informed Defendants that he suffered from hypertension. (ECF No. 140).

On March 8, 2020, Plaintiff was placed on a benzodiazepine detoxification regiment. (ECF No. 115-1).  On March 23, 2020, the MCDC promulgated the Standard Operating Procedure 05.00 Pandemic and Public Health Emergency. Procedure 05.00 applies to all MCDC staff and sets out guidance for the use of Personal Protective Equipment ("PPE"), isolation, and quarantine of inmates. (ECF No. 118-1). The policies implemented were designed to educate staff on CDC, State, and Local Department of Health Guidelines; appropriate quarantine and isolation of inmates; appropriate use of PPE; implementation of temperature checks; cleaning and disinfecting of jail surfaces; and limiting the transmission of Covid-19 by suspending fingerprinting, property releases, and lobby visitation. *Id.*

These policies were to be implemented by phases, depending on the ebb and flow of the pandemic. Phase One was implemented on April 30, 2020. Phase Two was implemented on May 27, 2020. Phase One was reactivated on June 17, 2020. Phase Two was reactivated on September

10, 2020. (ECF No. 118-1). The policies and procedures, as promulgated, were based on the evolving science as it was understood at the time and the policies and procedures represent a good-faith effort to limit the spread of the Covid-19 virus within the MCDC. *Id.*

Defendant Walker states the MCDC had a contract with Southern Health Partners, Inc. ("SHP") to provide health services to the inmates and the MCDC relied upon SHP "in this regard". (ECF No. 118-1, p. 1).

On June 22, 2020, Plaintiff complained of chills, body aches, dizziness, and slight chest pains. He was seen on June 24, 2020, and prescribed Tylenol and Ibuprofen for 14 days. At that time, Plaintiff's temperature was 98.1 degrees. (ECF No. 115-1).

On June 24, 2020, Plaintiff was moved from Max Bravo pod to West Echo quarantine pod due to a possible Covid-19 infection. (ECF No. 115-1). That same day, Plaintiff was seen by the medical staff for body aches, shivering, and chest pains. Plaintiff was instructed to increase his fluid intake. At that time, Plaintiff's temperature was 97.3 degrees. *Id.*

On June 27, 2020, Plaintiff put in a request to see the medical staff. On June 28, 2020, medical staff attempted to see Plaintiff, but he refused to take his medications. (ECF No. 115-1). Plaintiff states he did not take his medication because it was causing severe stomach pain. (ECF No. 140).

On July 1, 2020, the population at the MCDC underwent mass testing for Covid-19. The testing was performed as soon as practicable after it became available through the Arkansas Department of Health. (ECF No. 115-1). Nasal swabs were collected from the inmates and employees and the samples were sent to the Arkansas Department of Health for testing. The results showed Plaintiff tested positive for Covid-19. *Id.*

On July 10, 2020, Plaintiff was seen by the medical staff for shortness of breath and chest

pain. At that time his lungs were noted to be clear bilaterally and his temperature was 97.9 degrees. On that date, Plaintiff again refused to take his medications. (ECF No. 115-1).

On July 11, 2020, Plaintiff was seen by the medical staff after he complained of "not feeling better." (ECF No. 115-1). At that time Plaintiff's temperature was 97.9 degrees and a chest x-ray was ordered and performed that same day. The x-ray showed no evidence of acute cardiopulmonary disease, communicable disease, or active tuberculosis.  *Id.*

Defendant Walker states in her affidavit, "There is no evidence to suggest that any staff member of MCDC was deliberately indifferent to the needs of Plaintiff or failed to protect him." (ECF No. 118-1, p. 3). She also states, "All inmates were given cleaning supplies on a daily basis to allow them to clean their cells and mats. During COVID-19, this included cleaning supplies that had bleach in them." *Id.*

Defendant Landreth states in his affidavit, "There are times that inmates with mental illnesses are housed at MCDC and that is unavoidable even with all resources exhausted. There are times that inmates make noise while housed at MCDC and that is unavoidable even with all resources exhausted." (ECF No. 118-4, pp. 1-2).

In addition, Defendant Landreth states, "When Choate was transferred to ADC from Miller County, all mail, including any newspapers, that he did not receive while in custody was given to him." (ECF No. 118-4, p 2).

## II. PROCEDURAL BACKGROUND

Plaintiff filed his verified Complaint *pro se* on December 22, 2020, pursuant to 42 U.S.C. § 1983.  (ECF No. 1).  He asserts the following claims in the Complaint: Claim 1 - Future Harm; Claim 2 - Denial/Refusal Medical Care; and Claim 3 - Deliberate and Reckless Indifference to an

Imminent threat. (ECF No. 1, pp. 6, 8, 11).  He is suing Defendants in both their individual and official capacities.  *Id.*

On February 25, 2021, Plaintiff filed a Supplement to the Complaint asserting four additional claims: Claim 4 - Failure to Protect or Intervene and Future Harm; Claim 5 - Prolonged exposure to severely mentally-Inmate (excessive noise/sleep deprivation unsanitary living conditions); Claim 6 – Retaliation; and Claim 7 – Denial of Newspapers. (ECF No. 21). The Court notes this Supplement is not verified.

 On March 8, 2022, the County Defendants filed a Motion for Summary Judgment, Brief in Support, and Statement of Facts. (ECF Nos. 118, 119, 120). They argue Plaintiff's claims are without merit and they are entitled to summary judgment.

Plaintiff filed Responses to the motion and statement of facts. (ECF Nos. 139, 141). He also submitted a Notice of Other Arguments and a Supplement with 238 pages of exhibits. (ECF Nos. 142, 143).  However, none of these responses were verified. Plaintiff argues summary judgment is not appropriate because there are material facts in dispute.

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998). To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability on the part of a defendant, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted).

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010).

To sustain an official capacity claim against such an entity a plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). Thus, Plaintiff's official capacity claims against the County Defendants are "functionally equivalent" to alleging their employer, Miller County, had "a policy, custom, or [took an] official action" that deprived him of his constitutional rights. *Veatch,* 627 F.3d at 1275*; Johnson*, 452 F.3d at 973.

> To establish a claim for "custom" liability, Plaintiff must demonstrate:
>
> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the official of that misconduct; and
> 3) That Plaintiff was injured by acts pursuant to the government entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas County Medical Dept.,* 725 F.3d 825, p.  (8th Cir. 2013). "A single deviation from a written, official policy does not prove a conflicting custom." *Id.* (quoting *Jane Doe A v. Special Sch. Dist. of St. Louis,* 901 F.2d 642, 646 (8th Cir. 1990)).

## IV.  DISCUSSION

### A.  Claims Relating to Covid-19

Claims 1 – 4 involve overlapping allegations relating to Covid-19. Generally, Plaintiff alleges the County Defendants failed to protect him from present and future harm from Covid-19, failed to provide him adequate medical care for Covid-19, and exhibited deliberate and reckless indifference to the threat of Covid-19. Plaintiff also references inoperable panic/call buttons and

alleges he was subjected to unsanitary conditions of confinement which enhanced the risk of harm from Covid-19.[2]

### 1. Description of Claims 1 - 4

Plaintiff describes Claim 1 as "Future Harm". He alleges Defendants Runion, Walker, and Adams:

> Failure to report MCDC staff that tested positive for Covid-19 in early June 2020, failure to test inmates for Covid-19, failures to isolate/quarantine, deliberate and reckless disregard for PPE, deliberate and reckless to provide adequate sanitation, disinfectants, failure to consistently take inmate temperature, failures to consistently provide face masks, failure to reduce the inmate population to allow space to quarantine and failure to repair inoperable inmate emergency panic/call buttons in Max A/Max E lockdown cells.

(ECF No. 1, p. 6). For his official capacity claim Plaintiff states in part:

> My timely grievances, medical requests and personal conversations/complaints with staff concerning my symptoms will show that MCDC was fully aware of my serious medical conditions deliberately choose to ignore and deny proper Covid-19 testing and medical care to myself and others similarly situated …

*Id.*

In Claim 2, Plaintiff alleges Defendants Runion, Walker, and Adams denied him medical care from July 22, 2020, through July 13, 2020. (ECF No. 1, p. 8). He describes this claim as follows in relevant part:

> On 6/22/20 I and others were exhibiting clear symptoms of Covid-19. On 6/25/20 I and other inmates were moved to quarantine without being tested or even seeing medical staff. The quarantine had 10 beds, however it was so packed, there were even 4 or 5 inmates sleeping on the floor. Never were we tested, never did we see a Doctor our symptoms were severe …

> MCDC finally test the jail on 7/1/20. On 7/6/20 those test results revealed that out of 320 inmates 80 inmates were positive and 5 staff were positive, some of which had never missed a day of work.

---

[2] The Court has not included any of Plaintiff's allegations in his Complaint or Supplement which contain hearsay. Inadmissible hearsay may not be used to defeat summary judgment. *Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003).

> I was one of the 80 inmates who tested positive, my symptoms continued for 3 weeks. I filed grievances and numerous requests and at no time was I ever allowed to see a Doctor …

*Id.* Plaintiff describes his official capacity claim under Claim 2 almost word for word as he described it under Claim 1. *Id.* at p. 9.

In Claim 3, Plaintiff alleges Defendants Runion, Walker, and Adams exhibited deliberate and reckless indifference to the threat of Covid-19. Plaintiff specifically states in relevant part:

> At the beginning of June 2020, 3 MCDC staff tested positive for Covid-19. These infections were the 1st confirmed infections, yet MCDC hid the infection from the Arkansas Department of Health, Inmates in the jail, the families of those inmates and Defense Attorneys. Although my Covid-19 symptoms were clear, on 6/24/20 MCDC failed to administer Covid-19 tests to myself and other symptomatic inmates.
>
> Despite my requests to see a Doctor, I was only allowed to see nurses who were texting my situation with Doctor McCain …
>
> During the month I was infected with Covid-19 and was experiencing symptoms, MCDC and Nurses down played my symptoms, accused me of faking, denied me access to a Doctor and failed to treat my symptoms.

(ECF No. 1, p. 11). Plaintiff's description of his official capacity claim under Claim 3 is also like his claims in Claims 1 and 2. He states his "grievances, medical requests and personal conversations/complaints … [informed Defendants] of my serious medical condition and [they] deliberately chose to ignore and deny proper Covid-19 testing and medical care … *Id.* at pp. 11-12.

In Claim 4, Plaintiff alleges Defendants Runion, Walker, Adams, and Landreth failed to protect him from Covid-19. He specifically states in part:

> On 6/22/20, I and others in the jail started experiencing what appeared to be Covid-19 symptoms. I spoke with Head Nurse Steven King who told me to file a medical request on the kiosk, so I did … On 6/24/20 I, along with 14 others, were moved from regular housing locations and placed into West-echo quarantine. At no time

was I tested for Covid-19, nor were any of the others. At no time were we ever allowed to see any doctor, or doctor employed by Southern Health Partners …

I have hypertensio … MCDC disregarded these health risks. Just as they have for 10 months (especially since December 2020) disregarded PPE, stopped wearing or passing out face masks, stopped doing symptom checks, no testing or contact tracing and have kept the jail over max capacity … not allowing for social distancing or quarantine intake protocol …

Despite my grievances and personal direct requests to Warden Walker and Captain Adams, in Max Echo where I am housed, MCDC has deliberately withheld cleaning supplies from us…Even in a pandemic, from 11/6/20 to 12/5/20 we were unable to clean our cells at all, on 12/5/20 we were given only pinsol, on 12/7/20 we were given fabolouso, but weren't given bleach until 12/14/20 – equaling 39 days with no bleach or actual disinfectants …

From 12/21/20 to 1/1/21 we were unable to clean our cells, from 1/4/21 to 1/11/21 we were unable to clean or cells, and the current stretch from 1/18/21 to the present (1/29/21) we have been unable to clean our cells with any cleaners or proper disinfectants …

Also, in Max echo where I'm housed, the panic/call buttons are in-operable and have been since I was booked into the jail…due to the behavioral or mental nature of some inmates housed in Max Echo (who scream and beat on their cell doors for hours at a time) desperation attempts to get officers attention for medical help or other immediate attention are useless…

(ECF No. 21, pp. 1-4). As for his official capacity claim under Claim 4, Plaintiff states:

Any requests, complaint or grievances filed through MCDC's system bounce between staff through a 'run around' response system, causing the entire grievance/request system to be a 'dead end'. My requests … medical requests, grievances…were deliberately ignored…pre-existing health conditions were not enough to get the proper medical response or proper Covid-19 testing. MCDC also ignored CDC, Arkansas Department of Health and Jail Standards guidelines for Jail/Prison handling of Covid-19 protocol.

Regarding sanitation and other related issues (such as in-operable panic/call buttons and officers skipping scheduled well-fare checks), MCDC officials were made fully aware of these issues …

*Id.* at p. 4.

### 2.    Failure to Protect Claims 1-4

In *Helling v. McKinney,* 509 U.S. 25, 33-34 (1993), the Supreme Court held the Eighth

Amendment protects against future harm to inmates if the plaintiff proves threats to personal safety

from conditions, such as mingling of inmates with serious contagious diseases with other inmates,

and if the conditions reveal deliberate indifference to a substantial risk of serious harm. An Eighth

Amendment claim for failure to protect is comprised of two elements. First, an "inmate must show

that [he] is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v.*

*Brennan,* 511 U.S. 825, 834 (1994). Second, the inmate must establish that the Defendants

recklessly disregarded that risk. *Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998). The prison

official's state of mind is measured by a subjective, rather than an objective standard. *Farmer,* 511

U.S. at 838-839. "The subjective prong of deliberate indifference is an extremely high standard

that requires a mental state of more than gross negligence," namely, a "mental state akin to criminal

recklessness." *Saylor v. Nebraska,* 812 F.3d 637, 644 (8th Cir. 206) (citations and quotations

omitted).  ("[D]eliberate indifference must be viewed from [defendant's] perspective at the time

in question, not with hindsight's perfect vision").

"The Court is keenly aware of the significant health risks associated with COVID-19 and

the ease with which this disease is transmitted, especially in a prison setting." *Tate v. Arkansas*

*Dept. of Corr.,* No. 4:20-cv-0558, 2020 WL 7378805, *8 (E.D. Ark. Nov. 9, 2020).  However,

"[t]he prison is a finite space.  It would be impossible to isolate every inmate who is *potentially*

infected—the prison does not have enough space to house each such inmate in a single cell."

*Kesling v. Tewalt,* 476 F. Supp. 3d 1077, 1088 (D. Idaho 2020) (emphasis in original).

"As judges, our conscribed role is not to assess whether [the County Defendants] could

have done more to contain the virus—no doubt they could have.  Our limited role is thus to

determine whether [the County Defendants] ha[ve] made the requisite showing that [their] efforts to combat COVID-19 satisfied the constitutionally required minimum." *Valentine v. Collier,* 978 F.3d 154, 158 (5th Cir. 2020).   The Court notes while Plaintiff alleges the County Defendants failed to comply strictly with the guidelines of the CDC,[3] the failure to enact or comply with these guidelines does not equate to the violation of the Eighth Amendment.   *Id.* at 164 ("The Eighth Amendment does not enact the CDC guidelines").   Moreover, "[w]hat we know about COVID-19 and the spread of the novel coronavirus is constantly changing, as new information is released by medical researchers, agencies, and other authorities." *Kesling,* 476 F. Supp. 3d at 1087 (D. Idaho 2020).

As an initial matter, other than naming the County Defendants as individuals involved in being deliberately indifferent to the risk (present and future) of Covid-19, and failing to protect him from Covid-19, Plaintiff does not make any specific factual allegations against these Defendants. Consequently, Plaintiff has not alleged facts from which the Court can infer that any of the County Defendants deliberately disregarded a substantial risk of serious harm to him.

Moreover, the summary judgment record confirms on March 23, 2020, the MCDC promulgated extensive policies and procedures to deal with the threat of Covid-19. The Court finds these policies and procedures represented a good-faith effort to limit the spread of the Covid 19 virus within the facility. In addition, the summary judgment record shows on July 1, 2020, the MCDC underwent mass testing for Covid-19. The testing was performed as soon as practicable after it became available through the Arkansas Department of Health. Nasal swabs were collected

---

[3] Centers for Disease Control, *Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed November 30, 2021).

from the inmates and employees and the samples were sent to the Arkansas Department of Health for testing.

Accordingly, the Court finds the County Defendants are entitled to summary judgment on Plaintiff's personal capacity claims alleging they failed to protect him against Covid-19.

### 3.   Denial of Medical Care Claims 1 - 4

The Eighth Amendment prohibition of cruel and unusual punishment also prohibits deliberate indifference to the serious medical needs of prisoners. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on such a claim, Plaintiff must prove Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted). A plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need." *Gordon v.*

*Frank*, 454 F.3d 858, 862 (8th Cir. 2006).  However, intentionally denying or delaying access to medical care may constitute deliberate indifference.  *See Estelle,* 429 U.S. at 104-05; *Dulany*, 132 F.3d at 1239.

Here, Plaintiff tested positive for Covid-19 and consequently he clearly suffered from a serious medical condition. The question then becomes whether Plaintiff has alleged facts (rather than conclusions) from which the Court can plausibly infer the subjective prong for deliberate indifference has been met. "[L]egal conclusions and [t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements are not enough to state a claim for relief." *Ashcroft v. Iqbal,* 566 U.S. 662, 678 (2009). Plaintiff is required to plead facts that show more than the "mere possibility of misconduct." *Id.*

First, there is no evidence any of the County Defendants were personally involved in providing medical care to Plaintiff. At the MCDC medical care was provided by SHP. Even if the County Defendants did have some involvement or responsibility for the medical care provided to Plaintiff, the summary judgment record confirms Plaintiff was seen on June 24, 2020, by the medical staff two days after he complained of chills, body aches, dizziness, and slight chest pains. At that time his temperature was 98.1 degrees, and he was prescribed Tylenol and Ibuprofen for 14 days. That same day, Plaintiff was moved from Max Bravo pod to West Echo quarantine pod due to a possible Covid-19 infection. Plaintiff was seen again that day by the medical staff and was instructed to increase his fluid intake. At that time, Plaintiff's temperature was 97.3 degrees.

On July 10, 2020, Plaintiff was seen by the medical staff for shortness of breath and chest pain. At that time his lungs were noted to be clear bilaterally and his temperature was 97.9 degrees. On July 11, 2020, Plaintiff was seen by the medical staff after he complained he was not feeling better. At that time Plaintiff's temperature was 97.9 degrees and a chest x-ray was ordered and

performed that same day. The x-ray showed no evidence of acute cardiopulmonary disease, communicable disease, or active tuberculosis.

The Court finds the medical care provided to Plaintiff at the MCDC was more than constitutionally adequate. Although Plaintiff has a constitutional right to adequate health care, he does not have the right to health care of his choice (*i.e.* to be seen by a doctor). *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (an inmate has no constitutional right to a particular course of treatment). Accordingly, the County Defendants are entitled to summary judgment on the personal capacity claims based on denial of medical care to Plaintiff under Claims 1 – 4.

### 4.   Unsanitary Conditions Claims 1 - 4

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health

or safety of the prisoner." *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. Deliberate indifference is equivalent to criminal recklessness and requires a "reckless disregard to a known risk." *Schaub v. VonWald,* 638 F.3d 905, 014 (8th Cir. 2011). Negligence and even gross negligence are not enough. *Patterson v. Kelley,* 902 F.3d 845, 849 (8th Cir. 2018).

"[I]mates are entitled to reasonably adequate sanitation [and] personal hygiene…particularly over a lengthy course of time." *Beaulieu v. Ludeman*, 690 F.3d 1017 (8th Cir. 2012) citing *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989). "Conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." *Whitnack v. Douglas Cnty*., 16 F.3d 954, 958 (8th Cir. 1994) (quotations and citations omitted); *see also Smith v. Copeland*, 87 F.3d 265, 268-69 (8th Cir. 1996) ( holding that where plaintiff was subjected to an "overflowed toilet in his cell for four days," such "allegations regarding 'raw sewage' d[id] not rise to a level of constitutional significance' because plaintiff 'did not allege that he…suffered any other consequences of the exposure'); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (holding no Eighth Amendment violation where prisoner was confined to unsanitary cell for eleven days and noting that cleaning supplies were available to the prisoner).

Even accepting Plaintiff's claims that the County Defendants were aware of the conditions Plaintiff has described regarding the lack of adequate cleaning supplies off and on during a thirty-day period in December of 2020 and January of 2021, his claims based on unsanitary conditions of confinement still fail because there is no evidence Plaintiff suffered any harm from these conditions or that any of the County Defendants were deliberately indifferent to his health or safety.  The Court finds any discomfort Plaintiff may have suffered to be *de minimis,* and as a

result does not implicate the Constitution.  *See Smith,* 87 F.3d at 268. Accordingly, the County Defendants are entitled to summary judgment on Plaintiff's personal capacity claims relating to unsanitary conditions in Claims 1-4.

### 5. Inoperable Panic/Call Buttons

Plaintiff's allegations concerning inoperable panic or call buttons at the MCDC fails to state a claim under section 1983. The case law that exists on this subject concludes that lack of an intercom or call button in a cell, standing alone, does not rise to the level of a constitutional violation. Moreover, Plaintiff has not alleged he suffered any injury because of not having access to operational panic/call buttons. *See Garner v. City of Philadelphia,* 2013 WL 4401327, at *6 (E.D. Pa. Aug. 16, 2013) ("Although panic buttons may offer inmates additional safety and protection, we cannot find that active panic buttons constitute a 'minimal civilized measure of life's necessities.'" *See also DuPont v. Skrah,* 2017 WL 1160584, at *3 (D. Or. Jan. 30, 2017), *Report and Recommendation adopted,* 2017 WL 1159723 (D. Or. Mr. 27, 2017) ("[A]lthough the Eighth Amendment requires inmates to be able to communicate with corrections officers in order to summon medical assistance if necessary, it does not specifically mandate the availability of a functioning intercom in each prisoner's cell."). Accordingly, the County Defendants are entitled to summary judgment on the personal capacity claims based on the lack of operational panic/call buttons.

### 6. Official Capacity Claims under Claims 1-4

Finally, Plaintiff has not described any policies of Miller County which allegedly contributed to a violation of his constitutional rights to support any official capacity claims in Claims 1 - 4. Here, the MCDC had extensive written policies in place to limit the spread of Covid-19 and protect its staff and inmates. As previously stated, the Court finds these policies to be a

constitutionally adequate and reasonable response to the threat of Covid-19 especially where the science surrounding the prevention and treatment of Covid-19 is constantly changing.

Where Miller County has an express municipal policy which is constitutional on its face, generalized descriptions of violations of this policy by unidentified individuals employed by Miller County – even assumed to be true – cannot be considered a pattern of widespread and pervasive unconstitutional conduct. *Brewington v. Keener,* 902 F.3d 796 (8th Cir. 2018). The Supreme Court decided long ago that a municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability is not applicable under section 1983. *Monell v. Dept. of Social Service City of New York,* 436 U.S. 658, 694-695 (1978). "It is only when the 'execution of the government's policy or custom … inflicts the injury' that the municipality may be held liable under section 1983." *City of Springdale, Mass. v. Kibbe,* 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting) (quoting *Monell, supra,* at 436 U.S. at 694).

In sum, the Court finds there is no genuine issue of material fact which exists as to whether Miller County had an unconstitutional custom of exhibiting deliberate indifference to the significant risk of harm posed by Covid-19. It did not. Accordingly, the County Defendants are entitled to summary judgment on the official capacity claims set forth in Claims 1 – 4.

**B. Claim 5 – Prolonged exposure to Severely Mentally Ill Inmate**

In Claim 5, Plaintiff alleges Defendants Runion, Walker, Adams, and Landreth subjected him to excessive noise, sleep deprivation, and unsanitary living conditions by placing a mentally ill inmate near him for approximately thirty (30) days. (ECF No. 21, pp. 6-8). He goes on to state in part:

18

On December 19th, 2020 a severely mentally ill inmate … was placed into Max echo where I am housed, he was placed into cell #13. Within minutes of his placement into his cell … started beating, drumming, singing and yelling very loudly. This beating, drumming and screaming went on all night and all day, not just the next day but all day everyday until 1/1/2021 (12 days). He never slept or rested and was continuously making noise or talking (screaming) to (or at) himself. This noise done was so loud and so non-stop we couldn't even hear conversations in our own cell …

On 1/12/21, [the inmate] was moved back into our housing location and placed back into the same cell (ME13) … From the moment … returned on 1/12/21, he picked up right where he left off. The beating on his cell door, screaming at the top of his lungs and keeping up trash and filth continued …

I personally viewed … playing with his feces. Urine, feces and trash became a normal fixture in our day room, as it could easily be noticed leaking at all times from the cracks under his cell door…The area was cleaned sometime throughout the week, however, we were on a stretch of 11 days of not being able to clean in our cells…the loss/lack of sleep started wearing me down physically and mentally. Very disturbing thoughts caused me to question my sanity and I was placed on the list to see the mental health nurse...

Only on two occasions 1/25/21 and 1/27/21 did the Warden actually come to Max echo to view  … Both times … was in his cell with no clothing and large amounts of filth piled in front of his cell-door … 1/30/21 … marks 33 days of this torture and exposure to a severely mentally-ill inmate and lack of a basic daily living requirement …

*Id.* Plaintiff describes his official capacity claim as follows: "MCDC has a custom or policy of indiscriminately housing mentally-ill inmates, despite the degree of mental-illness, with regular inmates. In max echo there are two cells which can hold only one inmate each; MCDC has a custom of placing mentally-ill inmates in these cells…" (ECF No. 21, p. 8).

**1. Excessive Noise**

Allegations of excessive noise in a prison can support a valid Eighth or Fourteenth Amendment claim. Noise is considered extreme when it is harmful to the health and well being of inmates and inflicts pain without penological justification. *Brown v. Moore,* 93 F. Supp. 3d 1032

(W. D. Ark. 2015); *Williams v. Boles,* 841 F.2d 181, 183 (7th Cir. 1988) (incessant noise may cause agony even though it leaves no physical marks). *See also Gardner v. Andrews,* 2018 WL 2307011 at *3 (E.D. Ark. 2018) (excessive noise causing sleep deprivation can support an Eighth Amendment claim as sleep deprivation has long been recognized as an effective tool of torture). However, subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare"); *Murphy v. Dowd,* 975 F.2d 1229, 1234, (8th Cir. 1992).

Here, Plaintiff alleges he and other inmates were exposed to thirty plus days and nights of prolonged duration of yelling, beating, wailing, and crying at all hours of the day and night which caused him sleep deprivation and mental confusion. However, Plaintiff has not specifically alleged Defendants Runion, Adams or Landreth were personally involved in placing the mentally ill inmate near him. Plaintiff does specifically identify Defendant Walker as being involved in placing the inmate close to him. In addition, Defendants Walker states in his affidavit there are times that inmates with mental illnesses are housed at MCDC, and this is unavoidable even with all their resources exhausted. He also admits there are times that inmates make noise while housed at MCDC and this is unavoidable even with all resources exhausted.

The Court finds there are genuine issues of disputed fact concerning whether the thirty plus days Plaintiff was exposed to the loud noises made by the mentally ill inmate subjected him to unlawful conditions of confinement in the MCDC. Accordingly, the summary judgment motion on the personal capacity claim under Claim 6 relating to excessive noise is granted as to Defendants Runion, Adams, and Landreth because there is no evidence they were personally involved in placing the inmate in close proximity to Plaintiff. However, Defendants' summary judgment motion on the personal capacity claim against Defendant Walker is denied.

The Court also finds there are questions of disputed fact concerning whether the MCDC has a policy or custom which may have contributed to the excessive noise and potentially violated Plaintiff's constitutional rights. Because Defendants have not provided the Court with evidence as to who would have been responsible for enacting policies at the MCDC, the summary judgment motion as to all the County Defendants is denied on Plaintiff's official capacity claims under Claim 5 relating to excessive noise.

### 2. Unsanitary Conditions

Using the same analysis as that set forth in Claims 1-4, even accepting Plaintiff's claims that the County Defendants were aware of the conditions he describes regarding feces and urine and the lack of cleaning supplies which occurred because of his exposure to the mentally ill inmate, his claims against them based on unsanitary conditions of confinement still fail because there is no evidence Plaintiff suffered any harm from these conditions.  In addition, there is no summary judgment evidence to support that there was any custom of the MCDC which subjected Plaintiff to unsanitary conditions. Accordingly, the County Defendants are entitled to summary judgment as to Plaintiff's personal and official capacity claims relating to unsanitary conditions under Claim 5.

### C. Claim 6 – Retaliation

Plaintiff describes Claim 6 as retaliation and specifically states:

> The acts and omissions of this Claim #6 are the exact same as described in Claim #5 (exposure to mentally-Ill inmate), but with a contextual emphasis on Warden Jeffie Walker moving Inmate…from the psyche cell and returning him to Max echo…Warden Walker made this move of … returning to our housing location … despite our requests, grievances, complaints, etc. … which explain his excessive noise, feces and urine.
>
> My cell-mates … and myself have pending civil actions against MCDC (Warden Walker included). Around the time that MCDC (Defendants) were served of our

> complaints, all three of us were moved into the same cell. Warden Walker
> personally had [the inmate] moved back to Max Echo around this same time,
> despite knowing of the torture...Warden Walker has subsequently ignored
> complaints, this is clearly mental torture and retaliation.

(ECF No. 21, p. 10). Plaintiff describes his official capacity claim as, "The custom or policy in

this Claim #6 is the exact same as Claim #5, but adding MCDC's custom of retaliation against

inmates who file grievances or complaints." *Id.*

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected

activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary

firmness' from continuing in the activity;" and (3) the adverse action was motivated at least in part

by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.,*

673 F.3d 799, 807-808 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir.

2004)). Because nearly every otherwise routine administrative decision may potentially be viewed

as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse

since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89

F.3d 75, 79 (2d Cir.1996).

The Court finds this claim is without merit as it is undermined by the summary judgment

record and is supported only by Plaintiff's speculation and conjecture. First, Plaintiff fails to state

any claims based on retaliation against Defendants Runion, Adams or Landreth because he has not

alleged these Defendants were personally involved in placing the mentally ill inmate near him.

Even though Plaintiff states Defendant Walker placed the mentally ill inmate near him around the

time he filed the instant lawsuit and various grievances, "more than a temporal connection is

required to present a genuine factual issue on retaliation." *Arraleh v. Cnty. Of Ramsey,* 461 F.3d

967, 977 (8th Cir. 2006). In addition, Plaintiff continued to file grievances and amend the complaint

after the inmate was placed in close proximity to him. Without question, the placement of the noisy inmate in his pod did not chill or dissuade him from continuing in any constitutionally protected activities.

Likewise, Plaintiff's official capacity claim fails because he does not allege that any policy or custom of the MCDC was involved in the alleged violation of his constitutional rights. He simply sets forth a general unsubstantiated conclusion that the MCDC has a custom of retaliation against inmates who file grievances or complaints. Accordingly, the County Defendants are entitled to summary judgment on the personal and official capacity claims under Claim 6.

### D. Claim 7 – Denial of Newspapers

In Claim 7, Plaintiff alleges Defendants Runion, Walker and Adams denied him access to newspapers. He does not name Defendant Landreth in this claim. He describes the facts underlying this claim as follows:

> In December 2020, as a gift for the holidays, my family ordered 2 subscriptions for me. One was 'Prison Legal News" and the other a "local newspaper'. On 12/17/21 and 12/18/21 my cell-mate Randall Morris learned through a request … and a grievance … he had a newspaper clipping denied through the mail and we learned that MCDC has a policy that doesn't allow newspapers of any kind …
>
> I had my family cancel my two newspaper subscriptions. I also informed them they wouldn't be allowed to send related articles to aid in research of my current civil suit …

(ECF No. 21, p. 12). Plaintiff describes his official capacity as follows: "MCDC has a custom/policy that doesn't allow newspapers of any kind (clipped articles or articles printed for the internet included) to be delivered or mailed to inmates." *Id.*

Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). However, "confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment."

*Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125 (1977).  Inmates are not guaranteed receipt of all correspondence addressed to them but instead only have a limited liberty interest in their mail. *Thornburgh v. Abbbott,* 490 U.S. 401, 407 (1989). Restrictions on this First Amendment right are valid "only if [they are] reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987).

In *Turner,* the United States Supreme Court established four factors that courts should consider in determining whether a regulation is reasonably related to a legitimate penological interest: (1) whether there is a "valid rational connection" between the prison regulation and the government interest advanced; (2) whether prison inmates have an alternative means exercising the restricted right; (3) whether an accommodation would have significant impact on the prison staff, other inmates, and prison resources; and (4) whether there is a "ready alternative" that would accommodate inmates' rights "at *de minimis* cost to valid penological interests." *Turner,* 482 U.S. at 78, 89-91.

First, Plaintiff fails to state a personal capacity claim against any of the County Defendants because he has not alleged any of them were personally responsible for withholding newspapers from him. Instead, his allegations all stem from a policy of the MCDC which he alleges prohibited all newspapers, and various other publications, from being delivered to inmates. These allegations seem to be confirmed, at least in part, by Defendant Landreth's testimony that any newspapers that were withheld from Plaintiff were delivered to him upon his release from the MCDC.

Absolute bans on newspapers and magazines are, as a rule, unconstitutional. *See Bell v. Wolfish,* 441 U.S. 520, 547-48 (1978) (absolute bans on inmate access to newspapers and magazines violate the First Amendment because they are an exaggerated response to legitimate penological needs). Moreover, the County Defendants have not provided the Court with any

evidence concerning how withholding newspapers or other various publications are related to a legitimate penological interest. Accordingly, the Court finds there are questions of material fact concerning whether there was an absolute ban on newspapers. As previously stated, because the County Defendants have not provided the Court with any information as to which of the Defendants are policy makers, summary judgment on Plaintiff's official capacity claim under Claim 7 is denied as to all the County Defendants.

## V. CONCLUSION

For the reasons stated above, Defendants Runion, Walker, Adams, and Landreth's Motion for Summary Judgment (ECF No. 118) is **GRANTED IN PART and DENIED IN PART.**

The County Defendants are **GRANTED** summary judgment on the following claims:

1. Plaintiff's personal and official capacity claims against all the County Defendants set forth in Claims 1-4;

2. Plaintiff's personal capacity claims against Defendants Runion, Adams, and Lambert relating to excessive noise from exposure to a mentally ill inmate in Claim 5;

3. Plaintiff's personal and official capacity claims against all the County Defendants relating to unsanitary conditions resulting from exposure to a mentally ill inmate in Claim 5;

4. Plaintiff's personal and official capacity claims against all the County Defendants regarding retaliation in Claim 6; and

5. Plaintiff's personal capacity claims against all the County Defendants regarding denial of newspapers in Claim 7.

These claims are **DISMISSED WITH PREJUDICE.**

The Defendants, as specifically identified below, are **DENIED** summary judgment on the following claims:

1. Plaintiff's personal and official capacity claims against Defendant Walker relating to excessive noise in Claim 5;

2. Plaintiff's official capacity claims against all the County Defendants relating to excessive noise in Claim 5; and

3. Plaintiff's official capacity claims against all the County Defendants regarding a ban on newspapers and other various publications in Claim 7.

These claims remain for further resolution.

**IT IS SO ORDERED this 30th day of August 2022.**

/s/ *Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE