IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


WILLIAM CLAYTON CHOATE                                                    PLAINTIFF

v.                                    Civil No. 4:20-cv-04109-BAB

SHERIFF JACKIE RUNION;
CAPTAIN GOLDEN ADAMS;
NURSE STEPHEN KING; WARDEN
JEFFIE WALKER; DR. KEVIN MCCAIN;
and AL LANDRETH                                                          DEFENDANTS


**<u>MEMORANDUM OPINION</u>**

This is a civil rights action filed *pro* se by Plaintiff, William Clayton Choate, under 42 U.S.C. § 1983.  On February 10, 2021, the parties consented to have the undersigned conduct all proceedings in this case including a jury or nonjury trial and to order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF No. 16).

Plaintiff names as Defendants Sheriff Jackie Runion, Captain Golden Adams, Nurse Stephen King, Warden Jeffie Walker, Dr. Kevin McCann,[1] and Al Landreth.  Plaintiff claims Defendants violated his constitutional rights in both their individual capacities as well as official capacities.  Currently before the Court, is Defendants King and McCann's (hereinafter "Medical Defendants") second Motion for Summary Judgment.[2]  (ECF No. 166).  Plaintiff has filed a Response (ECF No. 171).

---

[1] Defendant McCann is incorrectly identified in the case caption as Dr. Kevin McCain.
[2] Defendants Runion, Adams, Walker, and Landreth have filed a separate second Motion for Summary Judgment, and that Motion will be addressed by separate opinion.

# I.   FACTUAL BACKGROUND

Plaintiff is currently incarcerated in the Arkansas Department of Corrections Texarkana Regional Correction Center in Texarkana, Arkansas.  His claims in this action arose while he was housed in the Miller County Detention Center ("MCDC") in Texarkana, Arkansas.

At all times relevant to Plaintiff's claims, Defendant King was a nurse, and Defendant McCann was a nurse practitioner servicing the MCDC.  Both Medical Defendants provided medical services to inmates housed at the MCDC through a contract with their employer—Southern Health Partners, Inc. ("SHP").  (ECF Nos. 168-1, p. 1; 168-3, p. 1).

On March 7, 2020, Plaintiff was booked into the custody of the MCDC.  (ECF No. 176-2, p. 1).  Plaintiff was convicted on August 6, 2020, (ECF No. 1, p. 4), and later transferred to the Arkansas Department of Corrections.

On March 23, 2020, the MCDC promulgated the Standard Operating Procedure 05.00 Pandemic and Public Health Emergency ("SOP").  The purpose of the SOP was to establish specific MCDC pandemic and public health emergency planning, response, and operational procedures.  The SOP applied to all MCDC staff and set out guidance for: the use of Personal Protective Equipment ("PPE"); isolation and quarantine of inmates; screening of inmates, staff, and persons entering the MCDC; cleaning and disinfecting the MCDC; reducing the population of the MCDC; visitation at the MCDC; and many other topics related to limiting the transmission of COVID-19.  (ECF No. 168-2, pp. 1-9).

The SOP also enumerated Phases of response to the COVID-19 pandemic.  *Id.*  The phases were to be implemented depending on the status of the pandemic and the need for additional precautionary policies and procedures.  Phase One was implemented on April 30, 2020.  Phase

Two was implemented on June 1, 2020.  Phase One was reactivated on June 17, 2020.  Phase Two was reactivated on September 11, 2020.  (ECF No. 168-2, p. 12-18).

The parties agree all members of the MCDC nursing staff were trained on the SOP.  As screening staff and inmates was an integral part of the SOP, the nursing staff was also trained on this screening policy and procedure.  In his Affidavit, Defendant King stated he believed all nursing staff followed the SOP screening policy.  Plaintiff did not dispute this statement.  (ECF Nos. 168, p. 2; 173, p. 1).

Additionally, Defendant King stated he never observed any member of the nursing staff blatantly disregarding COVID-19 PPE protocols.  However, he goes on to explain, that during the relevant period, PPE was not always available due to supply chain issues.  This unavailability caused shortages in gloves, masks, and other PPE items at the MCDC.  Plaintiff does not dispute these statements.  (ECF Nos. 168, pp.1-2; 173, p. 1).

The parties agree that the MCDC is a finite space, and given this limited space, it was impossible to isolate every inmate who was potentially infected with COVID-19.  (ECF Nos. 168, p. 1; 173, p. 1).

The parties also agree all COVID-19 testing was performed by the Arkansas Department of Health ("ADH"), and any contact tracing of infection was also under the purview of the ADH. (ECF Nos. 168, p. 2; 173, p. 1).

 The MCDC had an extensive policy for isolation and quarantine of individuals showing symptoms of COVID-19 or that tested positive for COVID-19.  In his Affidavit, Defendant King stated the MCDC nursing staff coordinated with MCDC corrections staff to implement these isolation and quarantine procedures.  Defendant King also stated he was unaware of any instances in which a nursing staff member failed to properly communicate to the MCDC corrections staff

the need for isolation or quarantine of an inmate.  Plaintiff does not dispute these statements.  (ECF No. 168, p. 2; 173, p. 1).

It is undisputed that Plaintiff exhibited symptoms of COVID-19 as early as June 22, 2020, and his infection of COVID-19 was later confirmed by testing on July 1, 2020.  (ECF No. 153).

On December 19, 2020, a mentally ill inmate[3] was moved into the Max Echo pod where Plaintiff was housed, and this inmate was housed in that pod in excess of thirty days.  (ECF No. 14, p. 6).  During this time, the mentally ill inmate banged on his cell door, screamed, and constantly made noises.  *Id.*  He also caused his urine and feces to leak from his cell into the pod dayroom.  *Id.*  Plaintiff was unable to sleep during the duration of the mentally ill inmate's housing in Max Echo pod.  *Id.*  The parties do not dispute these facts.

## II.     PROCEDURAL BACKROUND

Plaintiff filed his initial Complaint on December 22, 2020.  (ECF No. 1).  Subsequently, Plaintiff filed three additional Motions to Supplement his Complaint.  (ECF Nos. 14, 17, 18).  The Court granted these Motions to Supplement and directed the Motions be filed as Supplements on the docket sheet.  (ECF Nos. 19-21).

On October 7, 2021, Plaintiff filed an additional Motion to Supplement Complaint.  (ECF No. 77).  In this Motion to Supplement, Plaintiff requested leave to supplement his complaint with an additional claim of failure to train or supervise, and one new Defendant, SHP.  *Id.*  This Motion was the first time Plaintiff asserted a failure to train or supervise claim in this matter.  The Court addressed this Motion to Supplement along with discovery matters at a status conference on

---

[3] While the allegedly mental ill inmate is named numerous times by Plaintiff on the record in this matter, the Court finds it unnecessary to include his name herein.  Accordingly, he will be referred to throughout this Opinion as the "mentally ill inmate."  The Court notes it has no evidence to establish this inmate was in fact mentally ill, however, it assumes *arguendo* for the purposes of this Opinion since the parties do not dispute this fact.

November 2, 2021.  (ECF No. 80).  On November 3, 2021, the Court entered an Order addressing issues raised at the status conference.  (ECF No. 88).  In this Order, the Court granted Plaintiff leave to supplement his Complaint by adding the claim of failure to train or supervise but denied his addition of SHP as a Defendant.  *Id.*  However, the Court did not provide any direction to the Clerk or to Plaintiff to file his Motion to Supplement as a Supplement to his Complaint, and no such filing was made *Id.*  Accordingly, the Court will consider the Motion to Supplement filed on October 7, 2021 at Document Number 77 as the final Supplement to Plaintiff's Complaint.

In this Supplement filed on October 7, 2021, Plaintiff asserts the claim presently at issue.  Plaintiff's "Claim 8" is a failure to train or supervise claim alleged against the Medical Defendants.  (ECF No. 77).  Plaintiff alleges Medical Defendants failed to train or supervise on many issues, but as explained below, the only undisputed issue here is whether Medical Defendants failed to train or supervise regarding the housing of a mentally ill inmate in Plaintiff's pod.

On February 25, 2022, the Medical Defendants, filed their first Motion for Summary Judgment with accompanying Brief and Statement of Facts.  (ECF No. 114-116).  The Medical Defendants moved to dismiss Plaintiff's failure to train or supervise claim under the argument that Plaintiff failed to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 115 at 11).  On August 16, 2022, the Court issued a Memorandum Opinion granting the Medical Defendants' Motion for Summary Judgment and dismissed both Medical Defendants from this matter.  (ECF No. 153).  However, the Court failed to address the Medical Defendants' motion seeking to dismiss Plaintiff's failure to train or supervise claim against those Defendants.  *Id.*

On November 14, 2022, Plaintiff filed a Motion for Information/Relief.  (ECF No. 160).  In this Motion, Plaintiff requested information on why his claim for failure to train or supervise

was not addressed on summary judgment.  *Id.*  The Court construed this Motion as a Motion to Reconsider its Order on the Medical Defendants' first Motion for Summary Judgment.

On December 22, 2022, the Court granted Plaintiff's Motion for Reconsideration.  In this Order, the Court: (1) reinstated the Medical Defendants as defendants in this matter; and (2) granted leave to the Medical Defendants to file a second motion for summary judgment, if they so wished, for the specific purpose of addressing Plaintiff's failure to train claim against them.  (ECF No. 165).

On January 10, 2023, the Medical Defendants filed the instant second Motion for Summary Judgment, (ECF No. 166), Memorandum Brief in Support, (ECF No. 167), and Statement of Facts, (ECF No. 169).  In their second Motion for Summary Judgment, Medical Defendants argue: (1) Medical Defendants had no responsibility or authority for training or supervision over housing placements at the MCDC; (2) Plaintiff's constitutional rights were not violated through any of the complained of conduct; (3) Plaintiff has failed to show any deliberate indifference by the Medical Defendants in any failure to train or supervise; and (4) Plaintiff cannot meet proof with proof. (ECF No. 167).

Plaintiff filed a Response to the Medical Defendants' second Motion for Summary Judgment, (ECF No. 171), along with a Brief in Support, (ECF No. 172), and a Statement of Facts, (ECF No. 173).  In his Response, Plaintiff argues the Medical Defendants were personally involved in the housing of the mentally ill inmate.  Further, he argues he has pointed to the policy which gave the Medical Defendants the responsibility to properly screen, house, and treat mentally ill and special needs inmates.  The Medical Defendants "deliberately chose" not to remedy the situation with the mentally ill inmate.  Plaintiff also argues the Medical Defendants are the equivalent to "Prison Supervisor" as they supervise the medical department in the MCDC.  (ECF

6

No. 172, p. 3-4).

Plaintiff goes on to argue the Medical Defendants had the responsibility to properly screen, house, and treat mentally ill inmates within the MCDC, and when the Medical Defendants' "deviated from the Policy, they tacitly authorized a wide-spread and consistent 'custom' of housing [the mentally ill inmate] away from the designated area, and in a general population cell next to Plaintiff." *Id.* at 4. Medical Defendants' failure to properly house the mentally ill inmate, or the custom they created, led to Plaintiff's constitutional right violation. *Id.* at 5.

The Medical Defendants filed a Reply. (ECF No. 174). In their Reply, Medical Defendants note Plaintiff's entire Response is centered only on the issue of the mentally ill inmate's housing. Further, Medical Defendants argue they did not have authority over the housing of mentally ill inmates despite the policy cited by Plaintiff. Finally, Medical Defendants argue: Plaintiff has failed to show how the policies (or even failure to comply with these policies if they are construed as Plaintiff proposes) support a failure to train claim. (ECF No. 174).

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607.  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under Section 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities.  The type of conduct that is actionable and the type of defense available depend on whether the claim is asserted against a defendant in his official or individual capacity. *See Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal citations omitted).  "Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." *Id.*  Personal capacity claims "are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense" to these individual capacity claims. *Id.*  To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law, and that the actor violated a right, privilege, or immunity secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).  The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under

Section 1983.  *See Daniels v. Williams*, 474 U.S. 327 (1986); *See also Davidson v. Cannon*, 474 U.S. 344 (1986).

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).  To sustain an official capacity claim against such an entity a plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006).  Thus, Plaintiff's official capacity claims against Medical Defendants are "functionally equivalent," *Veatch*, 627 F.3d at 1257, to alleging their employer, SHP, had "a policy, custom, or [took an] official action" that deprived him of his constitutional rights, *Johnson*, 452 F.3d at 973.

To establish a claim for "custom" liability, Plaintiff must demonstrate:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the official of that misconduct; and

3) That Plaintiff was injured by acts pursuant to the government entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cty Medical Dept.*, 725 F.3d 825, p. 828 (8th Cir. 2013).  "A single deviation from a written, official policy does not prove a conflicting custom." *Id.* (quoting *Wedemeier v. City of Ballwin, Mo.,* 931 F.2d 24, 26 (8th Cir. 1991)).

## IV. DISCUSSION

The only issue before the Court is whether the Medical Defendants violated Plaintiff's constitutional rights by failing to train or supervise their subordinates.  As explained above, Plaintiff alleges this claim in his Supplement to his Complaint at Document Number 77, and

Plaintiff labels it as Claim 8. Specifically, Plaintiff states the following in his Claim 8 against the Medical Defendants as well as SHP (a nonparty to this lawsuit):[4]

> [SHP] are the medical contractor in charge of medical services to the [MCDC]. Health Team Administrator and head nurse Steven King and Doctor Kevin McCann are employees of SHP; however, they are the highest ranking officials in the facility. They are responsible for enforcing any policy of SHP and communicating information to the main office about circumstances which may require current policy to be updated and revised.
>
> [SHP] failed to train or supervise its employees at MCDC which resulted in [the Medical Defendants] allowing the official policy of SHP to be violated.
>
> Defendants failed to follow policy requiring (1) the proper wearing of masks and gloves during the Covid-19 pandemic; (2) failure to wear CDC and AOH recommended mask, gloves, gown, and shield when in contact with potential and confirmed Covid-19 positive staff/inmates; (3) failure to screen staff to prevent positive infections from entering the facility; (4) failure to test and contact trace inmates/staff who were symptomatic or in contact with symptomatic or positive staff/inmates; (5) failure to quarantine inmates awaiting positive or negative Covid-19 confirmation and proper separation following test results; (6) failure to screen, house, and handle mentally ill inmates resulting in extreme living conditions for other inmates.
>
> SHP failed to train or supervise its MCDC facility counter parts, which led to Plaintiff's constitutional rights being violated.

(ECF No. 77, pp. 10-12). Plaintiff asserts this Claim against Medical Defendants in both their individual and official capacities.

In his Response to Medical Defendants' Motion for Summary Judgment, Plaintiff did not dispute the following:

(1) Defendant King never observed his nursing staff blatantly disregarding proper PPE;

---

[4] The Court notes, it provided Plaintiff with a liberal construction of Claim 8 to include this allegation against the Medical Defendants—not just nonparty SHP. *See Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) ("When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible . . . then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework.") (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)).

(2) MCDC SOP included policy and procedure on screening of inmates and staff, and the nursing staff at MCDC was trained on such policies and procedures;

(3) All testing and contact tracing regarding COVID-19 was the responsibility of the ADH; and

(4) The MCDC SOP contained policy and procedure for quarantine and isolation of inmates, and the nursing staff of the MCDC communicated with the MCDC corrections staff when inmates needed quarantine and isolation.

(ECF No. 173). Accordingly, the only issue in dispute here is whether the Medical Defendants failed to train or supervise their subordinates with regards to the housing of mentally ill inmates; thus, causing a violation of Plaintiff's constitutional rights when he was housed next to a mentally ill inmate for thirty-plus days.

As Plaintiff has alleged both an individual and official capacity failure to train and supervise claim against the Medical Defendants, the Court will address each in turn.

## A. Individual capacity

In cases brought under Section 1983, supervisors are not liable for constitutional violations committed by their subordinates simply because they are their supervisors; instead, Plaintiff must plead each Defendant, "through [his] own individual actions," has violated the Constitution. *Marsh v. Phelps Cty*, 902 F.3d 745, 754 (8th Cir. 2018). (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Supervisors are only liable for their own misconduct. *Ashcroft*, 556 U.S. at 677. However, a prison supervisor can be held liable for failing to train or supervise subordinates when that failure caused the constitutional violation. *Tilson v. Forest City Police Dept.*, 28 F.3d 802, 806 (8th Cir. 1994).

To state an individual capacity claim for failure to train or supervise there must be allegations: (1) the supervisor knew of a pattern of unconstitutional acts committed by the subordinate; (2) the supervisor demonstrated deliberate indifference to, or unspoken authorization of, constitutional violations committed by subordinates; (3) the supervisor failed to take appropriate remedial action after learning of a subordinate's misconduct; and (4) the plaintiff was injured as a result of the failure to properly train or supervise subordinates. *Otey v. Marshall*, 121 F.3d 1150, 1156 (8th Cir. 1997). The standard for proving deliberate indifference is high. Even where prison officials know of a substantial risk to inmate health or safety, they are not liable, "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here the Medical Defendants initially argue neither Defendant King nor Defendant McCann possessed authority over, or responsibility for, the housing placements of any MCDC inmate; and therefore, they had no responsibility to train or supervise on such issues. As this would dispose of Plaintiff's claim, the Court must address this initial argument before analyzing the above enumerated elements of a failure to train or supervise claim.

In support of their initial argument, Medical Defendants produce their own sworn Affidavits stating they held no authority over the housing of MCDC inmates. (ECF Nos. 168-3, p. 2; ECF No. 168-1, p. 1). Plaintiff responds with SHP policies which he contends shows the Medical Defendants' authority and responsibility to identify, screen, and house mentally ill inmates. The first SHP policy Plaintiff submits is Section J.2.07 from the SHP Policy and Procedure Manual for Health Services in Jails for the MCDC ("SHP P&P Manual"). Plaintiff highlights the following language in this Section:

In order to develop and maintain maximum cooperation between correctional and medical staff in ensuring appropriate management of patients who are diagnosed as having significant medical or mental health illnesses or disabilities, SHP requires notification of correctional personnel by medical staff of those patients.  Correctional officers are to be notified by medical staff of any patients who have a significant medical or mental health illness or developmental disability.  This notification will help in the correctional officer's placement of the patient within the facility.  Further, the patient's special needs status may affect the imposition of disciplinary measures or transfers to another institution.

…

The Detention Facility's Medical Staff maintains procedures for the management of inmates diagnosed with diminished capacity, mental deficiencies or retardation until which time the courts order the inmate to an appropriate facility.

(ECF No. 172, p. 13).

Next the Plaintiff points to an MCDC policy and procedure titled Special Management Inmates SOP 12.06.  This policy states in pertinent part:

Special management treatment is to be initiated only when appropriate and under the direction of the health authority.  The special management time frame shall be as deemed necessary by the health authority.

(ECF No. 172, p. 18).  The term "health authority" is not defined in the portion of SOP 12.06 on the summary judgment record.

Next, Plaintiff refers to an untitled portion of the SHP P&P Manual on page 18.  This document states in pertinent part:

Patients with mental disorders may receive special care as defined below.  All patients will be evaluated for mental health problems either through intake screening or during their history and physical.  Patients exhibiting problematic/questionable behavior may be seen sooner through the local Emergency Room.  Patients exhibiting severe psychiatric disturbances should be housed in separate cells or in a housing unit designated for psychiatric patients.  Patients with continuous severe psychiatric disturbances should be transferred to either a state or local mental health facility for further evaluation and/or care, if available.  For every referral, there must be a documented medical history.

…

Medical staff is to notify correctional staff whenever significant enough medical or psychiatric illness exists to affect housing placement or activities.  Nursing staff may request a patient be housed out of the general population or checked by the detention staff

at staggered fifteen (15) minute intervals when there is a medically based reason, i.e. suicidal ideation, etc.

(ECF No. 172, p. 19).

Plaintiff also highlights "Section J?0?" titled Patient Care and Treatment Mental Health Screening of the SHP P&P Manual which states in pertinent part:

All patients with positive screens for significant mental health issues upon intake will receive a mental health evaluation.

…

Those patients who acquire acute mental illness or developmental disability services beyond the capabilities of the facility or whose adaption to the correctional environment is significantly impaired, will be referred to a Qualified Mental Health Professional or local mental health agency . . . .

Severe mental illness and/or disability cases should be reported to the security staff for housing assignment changes, if needed. Any determination by mental health staff or agency regarding transfer of a patient to a more appropriate facility must be reported to the Jail Administrator for implementation.

(ECF No. 172, p. 22).

Plaintiff argues these policies of SHP coupled with Defendant King's position as the Medical Team Administrator and Defendant McCann's position as Provider at the MCDC show they were supervisors over their departments; and thus, possessed the authority and responsibility to house mentally ill inmates. (ECF No. 172, p. 5). Additionally, Plaintiff argues Medical Defendants failed to produce their job descriptions. Therefore, there is nothing on the summary judgment record to contradict the policies produced by Plaintiff. (ECF No. 172, p. 9).

Plaintiff goes on to argue the SHP policies he references clearly show the Medical Defendants were required to, and should have, notified MCDC corrections staff that the mentally ill inmate needed special housing. Because the Medical Defendants did not follow or enforce the

14

SHP policies, Plaintiff's constitutional rights were violated.   (ECF No. 172, p. 5-6).   Plaintiff supports these arguments with his personal sworn Affidavit.   (ECF No. 172-1).

Medical Defendants, in their Reply, argue the SHP policies produced by Plaintiff merely show: (1) the nursing staff may request special housing for mentally ill inmates; (2) the nursing staff should notify correctional staff of any inmates' health conditions so the correctional staff may make appropriate housing assignments; and (3) the appropriate policies for screening of mentally ill inmates.   None of these policies, however, enumerate an authority or responsibility of the nursing or medical staff to supervise or train regarding housing assignments within the MCDC. (ECF No. 174).

The Court agrees with Medical Defendants' construction of the SHP P&P Manual policies produced by Plaintiff.   While Plaintiff has produced adequate evidence to question whether Medical Defendants had a responsibility to identify the mentally ill inmate, and possibly even request special housing for such inmate, he has failed to produce any evidence showing Medical Defendants possessed the authority to make housing selections for the mentally ill inmate. Furthermore, Plaintiff is incorrect that there is no evidence on the summary judgment record to dispute his assertion the Medical Defendants possessed authority over housing.   The Medical Defendants' Affidavits plainly state they did not possess authority over housing.   (ECF Nos. 168-1; 168-3). All the policies cited to by Plaintiff merely show Medical Defendants had the obligation and responsibility to notify MCDC corrections staff of mentally ill inmates special housing needs. This is insufficient to show Medical Defendants possessed the supervisory authority and responsibility to train and supervise such housing assignments.

Plaintiff's argument in Claim 8 is the Medical Defendants failed to follow the SHP policies, and it was this failure which violated his constitutional rights.   Further, there is no Section 1983

violation for failing to follow jail policy. *See Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993). Therefore, even if the Medical Defendants failed to satisfy the obligations placed upon them by the SHP P&P Manual—to notify MCDC corrections staff of any special housing needed for mentally ill inmates—this failure alone does not violate Plaintiff's constitutional rights. If anything, the policies produced by Plaintiff question whether Medical Defendants were negligent in failing to identify the mentally ill inmate's need for special housing.  However, negligence does not rise to the level of a constitutional violation; instead, Plaintiff must show the Medical Defendants were deliberately indifferent to his housing situation. *See Fourte v. Faulkner Cty Ark.,* 746 F.3d 384, 390 (8th Cir. 2014) (explaining that deliberate indifference is more even than gross negligence).  There is no evidence of deliberate indifference by the Medical Defendants on the summary judgment record here.

Furthermore, failing to follow jail policy does not establish a failure to train or supervise claim.  Even if Plaintiff established the Medical Defendants had supervisory authority over the MCDC corrections staff in housing assignments, Plaintiff would still need to produce summary judgment evidence to meet the elements of a failure to train and supervise claim.  Namly, he would need evidence calling into dispute whether: (1) the Medical Defendants knew of a pattern of placing mentally ill inmates in improper housing; (2) the Medical Defendants were deliberately indifferent to this pattern of improper housing of mentally ill inmates; (3) the Medical Defendants failed to remedy the improper housing of mentally ill inmates; and (4) the Medical Defendants failure to remedy the improper housing caused Plaintiff's injury. *See Otey*, 121 F.3d at 1156.

While Plaintiff alleges in his argument section: (1) the Medical Defendants were made aware of the subject mentally ill inmate's behavior and Plaintiff's injuries; and (2) the Medical Defendants deliberately chose not to remedy the situation, (ECF No. 172, p. 3), there is no

summary judgment evidence before the Court to support these allegations.  *See Nat'l Bank*, 165 F.3d at 610 ("A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment.").  Furthermore, to satisfy the elements of a failure to train or supervise claim, Plaintiff needs to show a pattern of improperly housed mental health inmates.  *See Otey*, 121 F.3d at 1156.  There is no such evidence on the summary judgement record.

Accordingly, the Court finds there is no issue of material fact as to whether Medical Defendants failed to train or supervise regarding the housing of mentally ill inmates causing Plaintiff's constitutional injury.  Medical Defendants are entitled to summary judgment on Plaintiff's failure to train and supervise claim against them in their individual capacities.

### A.  Official capacity

Plaintiff also alleges his Claim 8 against Medical Defendants in their official capacities. However, as the Court has determined Plaintiff failed to prove a cognizable claim against Defendants in their individual capacities, there can be no official capacity claim.  *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (The Eighth Circuit has consistently recognized without an underlying substantive constitutional violation against a defendant in their individual capacity, a Plaintiff cannot be successful on an official capacity claim against that defendant's employer.)

Accordingly, Medical Defendants are entitled to summary judgment on Plaintiff's official capacity claim for failure to train and supervise.

## V. CONCLUSION

For the reasons stated above, I recommend Defendants King and McCann's Second Motion for Summary Judgment (ECF No. 166) be **GRANTED** and Plaintiff's failure to train or supervise claim against them in their individual and official capacity claims be **DISMISSED WITH PREJUDICE**.   Furthermore, Defendants King and McCann should be **DISMISSED** from this matter.

**IT IS SO ORDERED this 30th day of August 2023.**

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE